**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 11-cr-306 (EGS)** |
| **v.** | |
| **PEDRO ALEJANDRO RUBIO-PEREZ,** | |
| **Defendant.** | |

**GOVERNMENT'S OMNIBUS MOTION *IN LIMINE***

The United States of America, by and through counsel, respectfully moves this Court to issue five pre-trial orders related to the trial in the above captioned case. First, the Government seeks to introduce at trial co-conspirator statements in the form of: 1) oral statements; 2) intercepted wire communications; and 3) consensually recorded conversations. Second, the Government seeks to admit evidence of other crimes as direct evidence of the multi-year, multi-member, complex international narcotics trafficking conspiracy, as being intrinsic or inextricably intertwined with the charged conspiracy, or in the alternative, pursuant to Federal Rule of Evidence ("Rule") 404(b). The Government seeks to introduce the following as other crimes inextricably intertwined with the charged conspiracy or alternatively admissible pursuant to Rule 404(b): 1) evidence of the Defendant and co-conspirator's use of violence; 2) evidence of the Defendant's involvement in money laundering, and 3) evidence of the Defendant's involvement in drug trafficking outside of the charged conspiracy. Third, the Government seeks to admit the prior conviction evidence pursuant to Fed. R. Evid. 609. Fourth, the Government seeks to admit transcripts and recordings at trial. Lastly, the Government seeks the Court's authorization to allow the lead case agent to sit at counsel table during the trial. For the reasons set forth below, the Government requests that the Court grant the instant motion.

## I.     THE INSTANT OFFENSE

### A. PROCEDURAL BACKGROUND

On October 15, 2011, a Grand Jury sitting in the United States District Court for the District of Columbia returned a one-count indictment against Pedro Alejandro Rubio-Perez (hereinafter "the Defendant") in this instant matter, Criminal Case No. 11-cr-306 (EGS).  The indictment charges the Defendant knowingly and intentionally distributing 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance and knowing and intentionally distributing 1,000 kilograms or more of a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance, knowing and intending that said controlled substances would be unlawfully imported into the United States from a place outside thereof; all in violation of Title 21, United States Code, Sections 959, 960, 963, and Title 18, United States Code, Section 2.  The Defendant was arrested in Mexico in October of 2013, on a Provisional Arrest Warrant requested by the United States in Criminal Case Number 11-cr-306 (EGS).  He was extradited to the United States and made his initial appearance on November 16, 2015.

### B. GOVERNMENT'S PROFFERED TRIAL EVIDENCE

The Government intends to introduce at trial evidence proving that the Pedro Alejandro Rubio-Perez was the leader of an international drug trafficking organization ("DTO").  The evidence will show that the Defendant directed and assisted in the arranging, financing, purchasing and transportation of multi-ton quantities of cocaine and marijuana for importation from Mexico into the United States for distribution.  Additionally, the evidence will identify the Defendant's local distribution cells, the transportation methods used by the DTO, and various members of the conspiracy.  The Government may also introduce evidence that the Defendant was lawfully

intercepted during a 2004 California state wire investigation (hereinafter "state wire"), and during a 2009 federal wire investigation in the District of Arizona (hereinafter "federal wire") discussing his drug trafficking activities.

The Government will prove that the Defendant directed and assisted in the arranging, financing, purchasing, and transporting significant quantities of cocaine and marijuana for importation from Mexico into the United States, where these narcotics were then distributed and sold.  The evidence will also show that the Defendant employed members of his organization in Mexico and the United States to obtain, conceal, smuggle and distribute cocaine and marijuana from Mexico to the states of California, Arizona, Texas, North Carolina, and other areas in the United States.  The Defendant oversaw the overall organization and planning of drug shipments. The Defendant's DTO utilized passenger cars with hidden compartments to smuggle cocaine into the United States at various ports of entry along the border between the states of California, Arizona and Texas.  The Defendant's organization also utilized passenger vehicles to smuggle marijuana into the United States from Mexico through the desert areas located along the border between the United States and Mexico that were not monitored by Customs and Border Patrol agents.  Once in the United States, the Defendant's organization utilized tractor trailers with hidden compartments in the refrigeration units and passenger vehicles, among other methods, to distribute the drugs to various cities throughout the United States.  The proceeds of the sale of narcotics were then sent back to the Defendant in Mexico utilizing the same smuggling methods in reverse order.

The Government will also introduce testimony that law enforcement officers learned that the Defendant sent shipments of cocaine ranging from 100 to 1,000 kilograms each and shipments of marijuana of 1,000 kilograms or more to the border cities of Mexico, which were then imported into and distributed throughout the United States at the Defendant's direction.  The evidence will

prove that the Defendant was responsible for the annual distribution of ton quantities of cocaine and marijuana within the United States.  Narcotics proceeds transported from the United States back to Mexico for the sales of these shipments totaled millions of dollars annually.

The Government will also introduce evidence that between 2004 and 2006, law enforcement agents made seizures of cocaine and marijuana loads that are attributed to the Defendant's DTO.  On May 19, 2004, law enforcement agents seized approximately 152 kilograms of cocaine and 22 pounds of marijuana from the home of one of the Defendant's co-conspirators in Yucaipa, California.  On August 15, 2006, law enforcement seized approximately 451 kilograms of marijuana from a tractor trailer in Phoenix, Arizona that belonged to the Defendant. Additionally, on October 28, 2006, law enforcement seized 90 kilograms of the Defendant's cocaine in the refrigeration unit of a tractor trailer, during a traffic stop in Springfield, Missouri.

The Government will prove at trial that the Defendant planned, organized and directed where the cocaine and marijuana shipments would be stored.  In order to protect these multi-kilogram shipments worth millions of dollars from being seized from law enforcement and rival DTO's, the Defendant employed armed gunmen for protection.  The Defendant also resorted to acts of violence to ensure the payment of debts.

## II.   CO-CONSPIRATORS' STATEMENTS SHOULD BE ADMITTED AT TRIAL

### A.  BACKGROUND

The Government seeks to introduce certain oral statements at trial that were made by the Defendant's co-conspirators during the course of, and in the furtherance of the charged conspiracy, pursuant to Fed. R. Evid. 801(d)(2)(E).  Furthermore, the Government's intends to introduce additional oral statements as well as intercepted wire communications from the state and federal

wire and consensually recorded conversations as co-conspirator statements pursuant to Fed. R.

Evid. 801(d)(2)(E).

The Government seeks to introduce statements in the following categories at trial: [1]

1.  <u>METHODS AND LOGISTICS:</u> Cooperating witnesses will testify about conversations they had with other co-conspirators, in furtherance of the conspiracy, about the methods and the individuals used by DTO for the distribution of narcotics into and throughout the United States. Specifically, they will testify about conversations with co-conspirators in Mexicali, Mexico who told the cooperating witnesses that the DTO's drugs were to be delivered in Alabama, North Carolina, New York and other states within the United States. During these conversations, the witnesses were given the names of the individuals to whom the drugs were ultimately distributed, and the parties discussed the payment of money to cover expenses, and instructions on the timing of the deliveries. They also discussed the logistics associated with the shipments such as the creation of legitimate trucking companies, the purchasing of the tractor trailers, and techniques to hide the drugs in the tractor trailers, including but not limited to purchasing legitimate loads to camouflage the drugs or using specialized secret compartments to hide the drugs during transport. For example, one of the declarants spoke with a cooperating witness about whether he knew of any tractor trailer drivers that would be interested in transporting cocaine for the DTO.

2.  <u>LOCATIONS:</u> Cooperating witnesses will testify about conversations they had with other co-conspirators, in furtherance of the conspiracy, about the locations throughout the United States where the organization stored large quantities of narcotics for distribution and stored the proceeds from drug sales. Specifically, the cooperating witnesses will testify about conversations with co-conspirators in which they discussed the location and the use of parking lots, warehouses, apartments, and privately owned businesses in Alabama, North Carolina, California, and Arizona, and other locations within the United States, which were used to store drug and drug proceeds. For example, one of the cooperating witness spoke to a declarant about picking up the drug proceeds from his/her business and concealing the money in a smaller SUV type vehicle to transport it to Mexicali, Mexico.

3.  <u>RETURN OF DRUG PROCEEDS:</u> Cooperating witnesses will testify about conversations they had with other co-conspirators, in furtherance of the conspiracy, about returning the proceeds of the marijuana and cocaine from the eastern portion of the United States to the Defendant and his DTO. Specifically, they will testify about conversations with co-conspirators about the location of stash houses, the methods and manners of receiving and counting the United States currency, and the transporting of the proceeds. For example, one of the cooperating witnesses spoke to a declarant about

---

[1] If additional information comes to light, the Government may seek leave to file a supplemental motion *in limine* to admit other evidence crimes at trial.

how to count and bundle the money in various denominations while in Charlotte, North Carolina.

4. <u>DISPUTES AND ACTS OF VIOLENCE:</u> Cooperating witnesses will testify about conversations they had with other co-conspirators, in furtherance of the conspiracy, about disputes that arose regarding the delivery of cocaine and marijuana to customers and the proceeds to the Defendant. They will also testify about the use of kidnapping, attempted murders, and armed guards to satisfy drug debts and secure shipments. For example, one of the declarants told a cooperating witness the precise amount of drugs proceeds that was supposed to be picked up in Birmingham, Alabama. The witness had a follow-up conversation with the declarant when the amount delivered was less than the required amount.

5. <u>SEIZURES OF DRUGS:</u> Cooperating witnesses will testify about conversations they had with other co-conspirators, in furtherance of the conspiracy, that were involved in the distribution of cocaine and marijuana that resulted in seizures by law enforcement that occurred on May 19, 2004, August 15, 2006, and October 28, 2006. Specifically, they will testify about conversations with co-conspirators related to prices, quantities, and timing of the delivery as well as the actual seizures and the aftermath. For example, one of the declarants told a cooperating witness to travel to Mexicali, Mexico where they discussed the August 15, 2006 seizure.

As discussed below, the Government submits that the proffered evidence at trial will establish that the oral statements, intercepted wire communications, and consensually recorded conversations meet the requirements set forth in Fed. R. Evid. 801(d)(2)(E), and therefore, should be admitted at trial.

B. <u>LEGAL STANDARD</u>

The Government seeks to introduce co-conspirator statements at trial pursuant to an exception to the hearsay rule. Fed. R. Evid. 801(d)(2)(E) provides that "a statement is not hearsay . . . if it is offered against a party and . . . was made by a co-conspirator of a party during the course and in furtherance of the conspiracy." *Id.* To admit such statements, a district court must find by a preponderance of the evidence that: 1) a conspiracy existed; 2) that the Defendant and the declarant were involved in the conspiracy; and 3) that the statement was made in furtherance thereof. *United States v. Bourjaily*, 483 U.S. 171, 175-76 (1987) (holding that the preponderance

of evidence must be proven by the offering party); *see also United States v. Brockenborrugh*, 575 F.3d 726, 735 (D.C. Cir. 2009) (reasoning that 801(d)(2)(E) allows for admission of statements by individuals acting in furtherance of lawful and unlawful joint ventures); *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006) (reasoning that "a court can preliminarily admit hearsay statements of co-conspirators, subject to connection through proof of conspiracy").  The D.C. Circuit additionally requires the Government to offer independent evidence of the conspiracy apart from the statement; however, the content of the statement itself can also be considered in determining whether such independent evidence exists.  *See also id.* at 201; *United States v. Gatling*, 96 F.3d 1511, 1520 (D.C. Cir. 1996) (holding that evidence of "the common purpose, participants, timing and interdependence" was more than sufficient for a reasonable juror to conclude that a conspiracy existed); *United States v. Beckham*, 968 F.2d 47, 50-51 (D.C. Cir. 1992) (holding that a hearsay statement, by itself, was not enough to establish a conspiracy); *United States v. Washington*, 952 F.2d 1402, 1407 (D.C. Cir. 1991), *cert. denied*, 503 U.S. 1009 (1992) ("'joint venturers'" may be admitted under Rule 801(d)(2)(E), even though no conspiracy is formally charged, if . . . there is substantial evidence independent of the statements that a conspiracy existed, that the defendant and the . . . declarant were members of the conspiracy, and that the statements were made in furtherance of it.").

There is no requirement that the Government prove the preliminary facts of the conspiracy prior to disclosing the co-conspirators' statements at trial.  *See United States v. Carson*, 455 F.3d 336, 365 n.26 (D.C. Cir. 2006).  "A court can preliminarily admit hearsay statements of co-conspirators, subject to connection through proof of conspiracy."  *Gewin*, 471 F.3d at 201; *see United States v. White*, 116 F.3d 903, 915 (D.C. Cir. 1997) (affirming the preponderance of evidence standard); *United States v. Perholtz*, 842 F.2d 343, 356 (D.C. Cir. 1988) ("The Supreme

Court has 'affirm[ed] the validity of the use of co-conspirator statements' in trials conducted in federal courts"); *United States v. Jackson*, 627 F.2d 1198, 1218 (D.C. Cir. 1980) ("Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances.'").  In fact, courts routinely admit such evidence "to avoid what otherwise would become a separate trial on the issue of admissibility."  *United States v. Gantt*, 617 F.2d 831, 845 (D.C. Cir. 1980), *abrogated on other grounds by In re Sealed Case*, 99 F.3d 1175, 1178 (D.C. Cir. 1996).

It is common practice for courts in the D.C. Circuit to admit co-conspirators' statements conditionally, subject to connection, at the close of the Government's case.  *See United States v. Loza*, 763 F. Supp. 2d 108, 112 (D.D.C. 2011) (holding that factual findings relevant to admissibility need not be made before the government presents evidence to the jury); *Brockenborrough*, 575 F.3d at 735; *United States v. Brodie*, 326 F. Supp. 2d 83, 89-90 (D.D.C. 2004) (allowing the admission of co-conspirator statements at trial subject to proof of connection); *United States v. Cooper*, 91 F. Supp. 2d 60, 78 (D.D.C. 2000) ("If substantial evidence of the connection has not been produced at the close of the government's case the court will instruct the jury to disregard the hearsay statements.").  Moreover, Fed. R. Evid. 104(b) expressly provides that "[w]hen the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."  *Accord Brodie*, 326 F. Supp. 2d at 89 (citing Rule 104(b) in denying a defense motion for a pretrial hearing on the admissibility of co-conspirator statements).

A criminal act of one co-conspirator, if committed within the scope of and in furtherance of the conspiracy, can be attributed to another co-conspirator provided that the criminal act was reasonably foreseen as a natural consequence.  *United States v. Mosquera-Murillo*, 151 F. Supp.

3d 130, 156 (D.D.C. 2015) (citing *Pinkerton v. United States*, 328 U.S. 640, 641 (1946)).   An

important factor to consider is whether the conspirators share a common goal.   *United States v.*

*Tarantino*, 846 F.2d 1384, 1393 (D.C. Cir. 1988) (noting that sufficient evidence established the

defendants joined in single drug conspiracy).   A conspiracy is an ongoing offense that lasts, absent

a co-conspirator's affirmative withdrawal from the enterprise, as long as any other co-conspirator

continues to further the common ends.   *United States v. Childress*, 58 F.3d 693, 733 (D.C. Cir.

1995) (finding that the defendant was criminally responsible for all foreseeable conduct in

furtherance of the conspiracy's goal); *see also United States v. Jimenez Recio*, 537 U.S. 270, 275

(2003) (a conspiracy does not automatically terminate simply because the Government,

unbeknownst to some of the conspirators, has defeated the conspiracy's object).

     C.   ARGUMENT

     1.   The Government's Proffered Oral Statements Should Be Admitted

     The oral statements from co-conspirators should be admitted in this case pursuant to Fed.

R. Evid.801(d)(2)(E) because the three prongs laid out in *Bourjaily* have been satisfied.   First, the

Government proffers that a conspiracy existed in which the Defendant, and other members of the

DTO were working together to traffic cocaine and marijuana to the United States.   Here, through

the presentation of witness testimony and physical evidence at trial, the Government proffers that

the evidence will show that the Defendant and other co-conspirators in Mexico and elsewhere,

were members of a conspiracy, the object of which was to import cocaine and marijuana into the

United States for ultimate distribution throughout the United States.   This evidence will

demonstrate that the cooperating witnesses conspired with the Defendant to coordinate the

logistics for each of the shipments and finance the DTO's transportation operation responsible for

trafficking the cocaine and marijuana into the United States. This clearly satisfies the first prong that a conspiracy existed by more than a preponderance of evidence.

Second, the evidence will show the declarants' direct involvement in this conspiracy. The Government's witnesses will testify that they were part of the drug trafficking conspiracy with the non-testifying declarants, and the Defendant. The witnesses will testify that the declarants who made statements within the categories listed above were members of the organization who: 1) organized transportation of cocaine and marijuana from Mexicali, Mexico into the United States; 2) received cocaine shipments near their final destinations in the United States; and/or 3) created legitimate companies and purchased tractor trailers to transport drugs. Additionally, the witnesses will testify that the declarants who made statements in categories one and three were also members of the organization that received the drugs and drug proceeds from their stores, warehouses, parking lots, and apartments. Witnesses will testify that the declarants who made the statements in category four were also members of the organization that would transport the drug proceeds from El Centro or Calexico, California and eventually smuggle them to Mexicali, Mexico. Furthermore, as discussed below, recorded communications between the Defendant and co-conspirator-1 (hereinafter "CC-1"), co-conspirator-2 (hereinafter "CC-2"), co-conspirator-3 (hereinafter "CC-3"), and co-conspirator-4 (hereinafter "CC-4") will also establish that the non-testifying declarants were members of the conspiracy. Therefore, the Government's evidence at trial will establish by preponderance evidence that the Defendant and the declarants of the proffered co-conspirators statements were engaged in the same conspiracy, thus satisfying the second prong under *Bourjaily*. *Bourjaily*, 483 U.S. at 175-76.

To satisfy the third prong, it is clear from the proffered evidence that these statements were made in furtherance of the conspiracy.  Most courts, including those in the District of Columbia, have interpreted the "in furtherance of" requirement broadly.  For example, all statements are admissible if they can "reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy."  *Tarantino*, 846 F.2d at 1412.  *See also United States v. Snider*, 720 F.2d 985, 992 (8th Cir. 1983), *cert. denied*, 465 U.S. 1107 (1984); *United States v. Patton*, 594 F.2d 444, 447 (5th Cir. 1979).  The evidence of co-conspirators statements that the Government is seeking to admit satisfies this low threshold. These statements directly show the Defendant's knowledge, intent, role, and participation in the conspiracy.  Namely, they illustrate how the Defendant was part of a conspiracy trafficking cocaine and marijuana loads through Mexico into the United States. These statements further show that the Defendant utilized armed bodyguards and employed tactics such as kidnapping in furtherance of the drug trafficking conspiracy.  These actions ensured that the drug supply would be transported securely and the drug debts would be settled.  The evidence will also show that the co-conspirator statements were made to further the transportation, storage, and distribution of cocaine and marijuana – all important aspects necessary to furthering the conspiracy's objectives to distribute large  quantities of drugs over the time period charged in the indictment.  Furthermore, as is required by this Circuit, the Government will also establish an independent basis for evidence of the conspiracy through testimony from cooperators who were a part of the conspiracy and evidence of drug seizures.  Therefore, the Court should admit the statements provisionally, consistent with common practice in this jurisdiction.

2. <u>The Intercepted Wire Communications and Consensually Recorded Communications Should Be Admitted</u>

The Government intends to introduce lawfully intercepted communications between by the Defendant and other non-testifying co-conspirators, CC-1, CC-2, and CC-3, as well as consensually recorded conversations between a testifying witness and a non-testifying co-conspirator, CC-4. The statements made by the non-testifying co-conspirators should be admitted in this case pursuant to Fed. R. Evid.801(d)(2)(E) because the Government will satisfy the three prongs laid out in *Bourjaily*. First, as previously stated above, the Government will prove at trial that a conspiracy existed between the Defendant and other members of the DTO. This satisfies the first prong by more than a preponderance of evidence.

The Government will satisfy the second prong through witness testimony that will establish that the declarants (the CCs) were members of the conspiracy. The Government anticipates that witnesses will testify at trial, among other things, that: 1) CC-1 drove the drugs from Mexico to various locations in California where they could be loaded into tractor trailer trucks; 2) CC-2 collected money in Mexicali, Mexico from various couriers; 3) CC-3 organized sourcing drug transactions for the DTO within the United States; and 4) CC-4 was a truck driver for the DTO.

For example, on May 16, 2004, law enforcement lawfully intercepted a conversation between the Defendant and CC-1. In this conversation, the Defendant discussed with CC-1 the total amount of the cocaine shipment and the breakdown of how much each recipient would receive. Specifically, the Defendant stated in the intercepted conversation,

> The annoying one, the one you didn't like and now he'll give it to you like that, two five. You didn't want it, that yes, no, you couldn't find any two five. The ex-old lady, I don't know how…two seven Alonso and Cabezon fifty. One five two is the total.

Bates # PARP00002040-PARP00002041.

Witnesses, who were members of the conspiracy, will testify that in this conversation the Defendant was instructing CC-1 how to distribute a shipment of 151 kilograms of cocaine and will identify the discussed individuals.  These witnesses will further testify about their involvement in this particular shipment of cocaine.  Furthermore, witnesses will testify that on or about May 20, 2004, a large quantity of cocaine and weapons were seized from CC-1's home in Yucaipa, California.

The Government may not identify the all of the callers in the intercepted wire communications, however, a party offering an out-of-court statement need not identify the declarant in order to establish that the declarant is a member of the conspiracy.  *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 52 (D.D.C. 2016); *see also United States v. El-Mezain*, 664 F.3d 467, 505 (5th Cir. 2011) ("The failure of a document to identify the declarant is not fatal to admissibility under Rule 801(d)(2)(E), however, if the facts and circumstances surrounding the making of the statement indicate that the speaker is a member of the conspiracy or joint venture"); *United States v. Ayala*, 601 F.3d 256, 268 (4th Cir. 2010) ("Regarding the first requirement [of Rule 801(d)(2)(E)], it is not necessary for the offering party to identify the declarant by name . . . Instead, the offering party need only show that the unknown declarant was more likely than not a conspirator" (internal quotations and citations omitted)); *United States v. Breitkreutz*, 977 F.2d 214, 219 (6th Cir. 1992) ("We do not think that the precise identity of a declarant is necessarily required for admission under Rule 801(d)(2)(E)"); *United States v. Cruz*, 910 F.2d 1072 (3d Cir. 1990) (holding that district court properly admitted statement of unidentified declarant under Rule 801(d)(2)(E)).  The Government will show that the unidentified declarants are members of the conspiracy by their discussions of impending drug transactions with the Defendant.  Specifically, the calls indicate that the Defendant is issuing orders, inquiring about timelines and amounts, and

making decisions about prices.  Furthermore, cooperating witnesses will testify that they were actively organizing drug transactions on behalf of the Defendant during the time period of these calls.  Therefore, the statements of these unidentified declarants in the wire communications are admissible as long as the circumstances surrounding the statements demonstrate that the declarant is a member of the conspiracy.

To satisfy the third prong, the Government asserts that these statements were made in furtherance of the conspiracy.  The evidence of co-conspirators statements that the Government is seeking to admit satisfies this low threshold and therefore, the Court should admit the statements provisionally, consistent with common practice in this jurisdiction.  These statements directly show the Defendant's knowledge, intent, role and participation in the conspiracy.  Namely, they illustrate how the Defendant and other co-conspirators were part of a conspiracy trafficking cocaine and marijuana from Mexico into the United States.  These statements further show how the Defendant and other co-conspirators were responsible for the coordination, production and trafficking of drugs for the DTO.  For example, the recorded conversations are in furtherance of the conspiracy because the co-conspirator gave specific instructions to the declarant ("CC-4") about the delivery of the cocaine to New York City.  *See Tarantino*, 846 F.2d at 1412. Additionally, the intercepted communications are in furtherance of the conspiracy because the Defendant gave specific instructions to the declarant about how to distribute the cocaine once it was in the declarant's possession.  *Id.*  Most courts, including in the District of Columbia, have interpreted the "in furtherance of" requirement broadly.  *Id.  See also Snider*, 720 F.2d at 992; *Patton*, 594 F.2d 444, 447.  Furthermore, as required by this Circuit, the Government will also establish an independent basis for evidence of the conspiracy through testimony from cooperators who were a part of the conspiracy and evidence of drug seizures.

Therefore, the intercepted and consensually recorded conversations from co-conspirators should be admitted in this case pursuant to Fed. R. Evid.801(d)(2)(E) because the three prongs laid out in *Bourjaily* have been satisfied.

## III.   INEXTRICABLY INTERTWINED EVIDENCE SHOULD BE ADMITTED

As stated above, the Defendant and other co-conspirators were members of a DTO led by the Defendant, based in Guadalajara, Mexico.  The Defendant was responsible for coordinating with his co-conspirators the transportation of multi-ton quantities of cocaine and marijuana from Mexico to various locations in the United States.  In support of these criminal acts, which directly and indirectly facilitated the overall conspiracy, the Government intends to offer additional evidence of other bad acts that are direct evidence of the Defendant's involvement in the drug distribution conspiracy and inextricably intertwined with this conspiracy.

### A.   PROPOSED EVIDENCE

#### 1.   Evidence of the Use of Weapons and Acts of Violence

At trial, the Government anticipates introducing direct evidence related to threats of violence committed directly or indirectly by the Defendant and his co-conspirators.  The Government anticipates testimony from cooperating witnesses that will establish that members of the conspiracy: 1) used armed bodyguards to protect themselves and their drug shipments from rival cartels and other drug trafficking organizations; 2) used violence or threats of violence to intimidate anyone who might prevent the organization from carrying out its drug trafficking activities; and 3) stored weapons at stash houses to protect drug shipments.

The Government anticipates presenting testimony that the Defendant used armed bodyguards at his home and when traveling in other areas to defend himself against attacks from rival traffickers.  Further, witnesses will testify that weapons were kept at stash houses located in

the United States to protect drugs that were stored at these locations. More specifically, on May 19, 2004, police executed a search warrant in Yucaipa, California at a location used by member of the conspiracy to store drugs, and seized one SKS semi-auto rifle, one Sig Sauer P-229 pistol, and one pistol, along with 152 kilograms of cocaine, $40,980 in United States currency, and drug packaging paraphernalia. At another location located in Moreno Valley, California that was connected to the DTO, officers recovered a 12 gauge shotgun and 3 shotgun shells.

Lastly, witnesses will also testify to the methods that the Defendants' DTO used threats of violence and actual violence to further the DTO's conspiratorial goals. For example, a co-conspirator will testify that the Defendant ordered him/her to kidnap an associate and hold him/her for two to four weeks until the associate paid for the kilograms of cocaine that the Defendant provided on credit. In another example, the Defendant hired an individual to murder a co-conspirator that owed him drug money.

### 2. Evidence of the Movement of Illicit Proceeds

At trial, the Government intends to introduce evidence of the drug trafficking conspiracy related to the movement of illicit proceeds. The Government intends to introduce evidence of the ways, methods and means that Defendant received drug proceeds as a result of his direct participation in the charged conspiracy. The evidence at trial will consist of cooperator testimony about the large sums of drug proceeds received by the Defendant for his investment in the cocaine and marijuana shipments that were imported and distributed in the United States as part of the conspiracy. The cooperating witnesses will testify as to the exact methods utilized by this DTO to account for each shipment and explain the transportation process of the illicit proceeds. Specifically, the Defendant would receive bulk cash inside of truck containers as payment for cocaine and marijuana imported into and sold in the United States. After the cocaine or marijuana

was given to the Defendant's clients in the United States, the clients would provide the proceeds of the sale of those shipments to the Defendant's drug transporters. These drug transporters loaded the money into the same tractor trailers that delivered the drug shipment and delivered the illicit proceeds to areas close to the U.S./Mexico border, where it was counted before being transferred to the Defendant in Mexico. For example, on May 19, 2004, police executed a search warrant in Yucaipa, California at a location used by member of the conspiracy and seized $40,980 in United States currency that was likely proceeds for the DTO.

### 3. Evidence of the Existence of the Conspiracy Prior to 1999

At trial, the Government intends to introduce evidence of the existence of the conspiracy prior to the dates charged in the indictment. Specifically, the Government will elicit testimony about narcotics transactions that commenced in the early 1990's and continued up to and through the timeframe charged in the indictment involving the Government's witnesses and the Defendant. These transactions utilized passenger cars with hidden compartments to smuggle cocaine and marijuana into the United States at various ports of entry along the border. Once in the United States, the co-conspirators utilized tractor trailers with hidden compartments to distribute the drugs to various cities throughout the United States. The proceeds of the sale of narcotics were then sent back to Mexico utilizing the same smuggling methods in reverse order. At the time of these transactions, the co-conspirators were unaware of the structure of the DTO or who ultimately controlled these operations. However, as they became more trusted and entrenched in the organization they were told by a co-conspirator that the Defendant was responsible for these 1990's transactions as he sourced the narcotics and was the ultimate recipient of the proceeds.

B. <u>LEGAL STANDARD</u>

Rule 404(b) of the Federal Rules of Evidence provides:

> Evidence of a crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. This evidence may be admissible for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident. On request by a defendant in a criminal case, the prosecutor must provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial and do so before trial – or during trial if the court, for good cause, excuses lack of pretrial notice.

Fed. R. Evid. 404(b) (2016).

Rule 404(b) "excludes only evidence 'extrinsic' or 'extraneous' to the crimes charged, not evidence that is 'intrinsic' or 'inextricably intertwined.'" *United States v. Allen*, 960 F.2d 1055, 1058 (D.C. Cir. 1992), *cert. denied*, 506 U.S. 881 (1992); *see also United States v. Gartmon*, 146 F.3d 1015, 1020 (D.C. Cir. 1998) (holding evidence that defendant charged with fraud had threatened a co-conspirator not "other crimes evidence" but instead "inextricably intertwined" with charged offense).

This Circuit has defined intrinsic "other crimes" evidence as: "'evidence . . . of an act that is part of the charged offense' or of 'uncharged acts performed contemporaneously with the charged crime . . . if they facilitate the commission of the charged crime." *United States v. McGill*, 815 F.3d 846, 879 (D.C. Cir. 2016) (citing *United States v. Bowie*, 232 F.3d 923, 930 (D.C. Cir. 2000).

Intrinsic evidence is admissible as direct evidence of the crimes charged and not subject to analysis under Rule 404(b).  Because intrinsic evidence, "by its very nature… does not involve *other* crimes, wrongs or bad acts…there is no concern that it might be used as improper character evidence," *United States v. Lerma-Plata*, 919 F. Supp. 2d 152, 156 (D.D.C. 2013), and therefore, Rule 404(b) does not apply.

As recently as 2016, the Circuit reaffirmed the intrinsic-extrinsic distinction:

A threshold question in determining the admissibility of evidence of other crimes and bad acts is whether the evidence, in actuality, relates to acts unconnected with those for which the defendant is charged, or instead is intertwined with the commission of charged crimes. Acts "extrinsic" to the crime charged are subject to Rule 404(b)'s limitations; acts "intrinsic" to the crime are not.

*McGill*, 815 F.3d at 879 (citing *Bowie*, 232 F.3d at 927) (noting *Bowie's* reading of the Rule);

*United States v. Mahdi*, 598 F.3d 883, 891 (D.C. Cir. 2010)).

As a practical matter, "[w]hen evidence is 'inextricably intertwined' with the charged crime [or intrinsic], courts typically treat it as the same crime," *Bowie*, 232 F.3d at 927, and admit such evidence. The D.C. Circuit has explicitly recognized "that evidence can be intrinsic to the crimes charged." *United States v. Sitzmann*, 856 F. Supp. 2d 55, 59 (D.D.C. 2012). This is particularly true in the context of conspiracy. *See United States v. Mathis*, 216 F.3d 18, 26 (D.C. Cir. 2000) (prosecution "usually allowed considerable leeway in offering evidence of other offenses"). According to *McGill* , "'[w]hen [the] indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself.'" *McGill,* 815 F.3d at 881 (citing *United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994)) (holding that acts of violence committed or threatened by appellants during their participation in the conspiracy was correctly admitted as intrinsic evidence not subject to Rule 404(b) analysis)).

The D.C. Circuit has acknowledged that there are even "several forms of 'other crimes' evidence . . . [that] are not considered extrinsic within the meaning of Rule 404(b)." *United States v. Badru*, 97 F.3d 1471, 1474 (D.C. Cir. 1996). For instance, evidence of uncharged crimes may be intrinsic if it "arose out of the same series of transactions as the charged offense." *Weeks v. United States*, 716 F.2d 830, 832 (11th Cir. 1983). Thus, "[a]s long as evidence of the uncharged criminal conduct is offered as direct evidence of a fact in issue and not as circumstantial evidence

of the character of the accused, it is admissible independent of its superficial similarity to that which would be considered evidence of 'other crimes' under Rule 404(b)." *United States v. Gray*, 292 F. Supp. 2d 71, 77-78 (D.D.C. 2003) (citing *Badru*, 97 F.3d at 1475) (citing 22 Charles A. Wright and Kenneth W. Graham, Jr., Federal Practice and Procedure § 5239, at 450 (1978)); *see also Mahdi*, 598 F.3d at 891 (upholding the admission of uncharged bad acts as intrinsic evidence not subject to Rule 404(b) analysis that made clear the nature of the conspiracy and "the kind of organizational control" the defendant exercised to be).

Furthermore, a criminal act of one co-conspirator, if committed within the scope of and in furtherance of the conspiracy, can be attributed to another co-conspirator provided that the criminal act was reasonably foreseen as a natural consequence. *Mosquera-Murillo*, 151 F.Supp.3d at 156 (citing *Pinkerton v. United States*, 328 U.S. 640, 641 (1946)). An important factor to consider is whether the conspirators share a common goal. *Tarantino*, 846 F.2d at 1393; *see United States v. Washington*, 106 F.3d 983, 983 (D.C. Cir. 1997). *Pinkerton* liability for acts of co-conspirators can apply to charges of acts of violence, use of weapons, and money laundering in a drug conspiracy case, as long as those acts were done in furtherance of the conspiracy and were reasonably foreseeable to co-conspirators. "*Pinkerton* co-conspirator liability exists, moreover, even where the substantive offense is not an overt act alleged in the indictment.  It requires only that the substantive offense be committed in furtherance of the conspiracy and reasonably foreseeable as a necessary or natural consequence of the unlawful agreement." *United States v. Moore*, 651 F.3d 30, 94 (D.C. Cir. 2011).  Therefore, the Defendant can be liable for money laundering, weapons possession, and acts of violence that were committed by his co-conspirators in furtherance of the conspiracy.

## C. <u>ARGUMENT</u>

C. <u>ARGUMENT</u>

The Government's proffered evidence should be admitted as inextricably intertwined with the charged conspiracy.  This evidence arose out of the same series of transactions as the charged offense and were committed in furtherance of the drug trafficking conspiracy, and/or are evidence of the drug trafficking conspiracy itself.  Here, violence, use of weapons, and coordinating the movement of drug-related proceeds were performed contemporaneously with and in furtherance of the charged offense.  Namely, in order for the DTO to effectively run its operation of trafficking narcotics from within Mexico and into the United States, and to ward off competition, protect the narcotics, and maintain stability within the DTO, the Defendant and co-conspirators utilized threats of violence and possessed weapons to further their narcotics trafficking operation. Additionally, the trafficking of marijuana and cocaine outside of the time frame of the charged conspiracy was organized by members of the charged conspiracy, using the same methods as the charged conspiracy, and relates to how the witnesses knew the Defendant.  Lastly, as narcotics were being trafficking during the course of this conspiracy, the Defendant and their co-conspirators were involved in the movement of millions of dollars that constituted payment for and proceeds from their drug trafficking activities.  These inextricably intertwined money laundering activities directly supported the efforts of the DTO as it took large sums of money to keep the multi-member, international illegal operation running.  As such, the above actions should be admitted as intrinsic evidence.

### 1. Possession of Weapons and Threats of Violence and Actual Violence

1. <u>Possession of Weapons and Threats of Violence and Actual Violence</u>

As detailed above, the Government intends to introduce evidence that the Defendant and other co-conspirators threatened violence, committed actual violence, and used weapons in furtherance of the conspiracy.  These actions were also necessary to maintain territory and drug

trafficking routes within Mexico, to ward off rival cartels, collect drug debts, and to avoid detection, seizure and prosecution from law enforcement.  Evidence of the use of weapons, and threats or acts of violence should likewise be admitted as intrinsic evidence of the charged conspiracy.

Courts in this Circuit have on numerous occasions found that a defendant's possession or use of weapons constitute contemporaneous conduct designed to facilitate and advance the goals of a charged conspiracy to traffic narcotics.  *United States v. Gooch*, 514 F. Supp. 2d 63, 70 (D.D.C. 2007), *aff'd*, 665 F.3d 1318 (D.C. Cir. 2012); *Lerma-Plata*, 919 F. Supp. 2d at 158 (holding that proposed evidence of defendant's conspiracy to launder money and traffic firearms was intrinsic to the charged drug conspiracy as contemporaneous acts that facilitated the commission of the charged offense); *United States v. Lorenzana-Cordon*, 141 F. Supp. 3d 35, 43 (D.D.C. 2015).

In *Lerma-Plata*, where the defendant was charged with drug trafficking, the Court noted that removing portions of the defendant's conversations that pertained to firearms trafficking would not portray an accurate picture of the manner and means by which the DTO executed the drug conspiracy and would not paint an accurate picture of the defendant's role in the conspiracy, as the trafficking of firearms would clearly constitute direct evidence of the manner and means used by the DTO to carry out the conspiracy.  *Lerma-Plata*, 919 F. Supp. 2d at 158.  Similarly, the Government intends to introduce evidence of the drugs seized at a stash house maintained by one of the Defendant's co-conspirators, which also contained a cache of weapons.  This evidence is necessary as it demonstrates how the Defendant and members of his DTO were often armed and used weapons to protect drug shipments that were housed in various locations.  The co-conspirator's possession of weapons constitute contemporaneous conduct designed to advance the

goals of the conspiracy to traffic narcotics.   Therefore, the Government's proffered evidence should be admitted as inextricably intertwined with the charged conspiracy.

Evidence of threats of violence, actual violence, and use of weapons is intrinsic to the charged conspiracy.   The Government's witnesses will explain that members of the DTO used weapons, threats of violence and actual violence to further their conspiratorial goals.   This evidence demonstrates that the DTO committed these acts to facilitate the commission of the charged conspiracy and to support their drug trafficking activities.   For example, the kidnapping of an associate to satisfy a drug debt showed that the DTO often resorted to violence to resolve issues. In another example, the Defendant hired an individual to murder a co-conspirator that owed him drug money.   These actions were directly intertwined with the drug trafficking conspiracy as it arose out of the same transactions as the charged offense and are part in parcel with how this drug trafficking organization operated.   Moreover, the conduct occurred within the timeframe of the charged conspiracy and are intrinsic or inextricably intertwined with the crime itself.   For the foregoing reasons, this evidence should be admitted as direct proof of the conspiracy.

## 2.   Evidence of the Movement of Illicit Proceeds

Furthermore, the Government intends to introduce evidence of the movement of drug proceeds by members of the conspiracy from the United States back into Mexico.   More specifically, the Government intends to introduce evidence of the shipment of drug proceeds into Mexico from the United States as payment for the sale and trafficking of narcotics.   This movement of drug proceeds occurred contemporaneously with the drug trafficking charged in the conspiracy as a result of the completion of successful drug shipments.   Therefore, the Court should find that the movement of drug proceeds is inextricably intertwined with the drug trafficking conspiracy.

"Evidence of an uncharged offense arising out of the same transactions as the offense charged in the indictment is not extrinsic evidence within the meaning of Rule 404(b)." *United States v. Morrow*, No. 04-355, 2005 WL 3159572, at *6 (D.D.C. Apr. 7, 2005) (slip op.) (citing *United States v. Krout*, 66 F.3d 1420, 1425 (5th Cir. 1995)).   The anticipated testimony from cooperating witnesses detailed above reveals that the Defendant received drug proceeds as a direct result of his participation in the charged conspiracy.   Specifically, the Defendant received bulk cash payments as payments for cocaine and marijuana he produced for the DTO.   "'An act that is alleged to have been done in the furtherance of the alleged conspiracy…is not an 'other act' within the meaning of Rule 404(b); it is part of the very act charged.'" *Id.* at *5 (citing *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992)).   Moreover, D.C. courts have previously found that an "alleged conspiracy to launder money…is properly intrinsic to the charged drug conspiracy as contemporaneous acts that facilitated the commission of the charged offense." *Lerma-Plata*, 919 F. Supp. 2d at 158.

The proposed evidence involves acts of money laundering that are inextricably intertwined with the manner and means used by the DTO to carry out the charged drug conspiracy.   The financing of drug transactions and the movement of money – according to the Court in *Lerma-Plata*, "the very nuts-and-bolts of any drug trafficking operation" -- are "contemporaneous conduct designed to facilitate and advance the goals of [the organization and] the charged conspiracy," and are additionally part and parcel to the crime charged.   *Id.* at 158, 160.   Such steps facilitate the commission of the charged crimes; are acts conducted in furtherance and during the drug conspiracy; and are vital to its survival.   Accordingly, the proposed evidence should be admitted

as direct proof of the charged conspiracy.[2]   Therefore, this evidence should be admissible at trial

as inextricably intertwined evidence.

4.   Evidence of the Existence of the Conspiracy Prior to 1999

The Government seeks to admit evidence of the existence of the drug trafficking conspiracy

that pre-dates the time period charged in the indictment as intrinsically intertwined with the

charged conspiracy.  This evidence would be introduced through Government witnesses who were

members of the charged conspiracy, and their testimony relates to how they know the Defendant.

This testimony would include their prior drug trafficking activities with the Defendant.  Because

these relationships pre-date the timeframe of the charged conspiracy, this evidence is intrinsic to

their relationship with the Defendant and their involvement in the charged conspiracy. The

witnesses' familiarity with the practices of the Defendant and his subordinates is intrinsically

intertwined with the witnesses' testimony of events relating to the charged conspiracy.

Identity of the defendant as the perpetrator of the charged offense is always an item that

must be proved beyond a reasonable doubt.  *Jones v. United States*, 361 F.2d 537, 542 (D.C. Cir.

1966).  Consequently, establishing the Government's witnesses' ability to identify the Defendant

as the individual participating in the charged conspiracy is intrinsic evidence of the charged

conspiracy.  The witnesses' familiarity with the subordinates of the Defendant and the business

model of the Defendant, is directly connected with these witnesses' prior involvement in drug

trafficking with the Defendant.  *Bowie*, 232 F.3d, at 929 (D.C. Cir. 2000) ("some uncharged acts

performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the

commission of the charged crime").  A defendant's conduct is also intrinsic evidence when it

_____

[2] It should be noted that there is a criminal forfeiture allegation in the charged Indictment, and as
such, evidence of the Defendant's and the DTO's finances and assets should be admitted at trial to
avoid having to present a bifurcated criminal forfeiture phase of the trial.

"arose out of the same transaction or series of transactions as the charged offense, if it was inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime of trial."  *Badru*, 97 F.3d at 1474 (internal quotation marks and citation omitted).

Cooperating witness testimony about prior relationships with Defendant, which includes their prior drug trafficking activities together, demonstrates how the cooperating witnesses and the Defendant knew each other.  Furthermore, the testimony proves that a conspiracy existed prior to the dates charged in the conspiracy and helps explain the commission of the acts in furtherance of the charged conspiracy.  The witnesses had previously worked in identical roles with the Defendant to transport cocaine, marijuana, and proceeds on tractor trailers in the United States, and their involvement with the charged conspiracy was a continuation of the same series of transactions that occurred prior to 1999.  The evidence of the existence of the drug trafficking conspiracy that pre-dates the time period charged in the indictment is intrinsically intertwined with the charged conspiracy.  Therefore, because the described above are intrinsic evidence of and intrinsically intertwined with the charged conspiracy, this evidence falls outside the prohibitions of Rule 404(b) and should be admitted.

## IV.    IN THE ALTERNATIVE, THE OTHER CRIMES EVIDENCE SHOULD BE ADMITTED PURSUANT TO FEDERAL RULE OF EVDIENCE 404(B)

Should the Court determine that the evidence the Government views as inextricably intertwined is not admissible under this theory, the Government seeks to admit this evidence, in the alternative, pursuant to Rule 404(b).

### A.  LEGAL STANDARD

Rule 404(b) permits the admission of "evidence of other crimes, wrongs, or acts" to prove a material issue other than character, such as "motive, opportunity, intent, preparation, plan,

knowledge, identity and absence of mistake or accident." *Id.* "Under the law of this circuit, 'Rule 404(b) is a rule of inclusion rather than exclusion'…and it is 'quite permissive,' excluding evidence only if it is offered for the sole purpose of proving that a person's actions conformed to his or her character." *United States v. Long*, 328 F.3d 655, 660-61 (D.C. Cir. 2003) (quoting *Bowie*, 232 F.3d at 923) (citations and quotations omitted). The Rule lists several permissible purposes of other crimes – e.g., to prove "motive, opportunity, intent, preparation, plan, knowledge, identity and absence of mistake or accident;" however, this list is "not exhaustive." *United States v. Miller*, 895 F.2d 1431, 1435 (D.C. Cir. 1990). "[T]he Government need not show that the evidence is being offered for one of the purposes specifically enumerated in the rule," *Lerma-Plata*, 919 F. Supp. 2d at 155. As the D.C. Circuit noted, "in some cases '[e]xtrinsic acts evidence may be critical…especially when th[e] issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct.'" *United States v. Brown*, 597 F.3d 399, 404 (D.C. Cir. 2010) (quoting *Huddleston v. United States*, 485 U.S. 681, 685 (1988)). Even a collateral showing of character is insufficient to bar the evidence. "True, the evidence may tend to show that [the defendant] is a person of bad character, but Rule 404(b) does not thereby render it inadmissible…under Rule 404[b], '*any* purpose for which bad acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character.'" *United States v. Cassell*, 292 F.3d 788, 795 (D.C. Cir. 2002) (quoting *Miller*, 895 F.2d at 1436) (emphasis added); *see also McGill*, 815 F.3d at 878 (Rule 404(b) prohibits only that evidence which lacks any purpose but proving character).

Finally, the D.C. Circuit has long-held that crimes that involve a conspiracy charge "increase the probativeness of Rule 404(b) evidence." *Manner*, 887 F.2d at 322 (citing to *United States v. Sampol*, 636 F.2d 621, 659 n.23 (D.C. Cir. 1980)). Indeed, in conspiracy prosecutions,

the government is "usually allowed considerable leeway in offering evidence of other offenses to inform the jury of the background of the conspiracy charged … and to help explain to the jury how the illegal relationship between the participants in the crime developed.'" *McGill,* 815 F.3d at 879 (quoting *Mathis*, 216 F.3d at 26).

Furthermore, Rule 403 strongly favors admission of 404(b) evidence. "Rule 403 tilts, as do the rules as a whole, toward the admission of evidence in close cases, even when other crimes evidence is involved." *United States v. Douglas*, 482 F.3d 591, 600 (D.C. Cir. 2007) (citing *Cassell*, 292 F.3d at 795) (internal quotation marks omitted). "In determining whether 'the probative value is substantially outweighed by the danger of unfair prejudice' it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged." *United States v. Harrison*, 679 F.2d 942, 948 (D.C. Cir. 1982) (quoting *United States v. Day*, 591 F.2d 861, 878 (D.C. Cir. 1978)).

The D.C. Circuit has consistently minimized the risk of potential prejudice not by exclusion, but by issuing limiting instructions to the jury. *See, e.g.*, *Cassell*, 292 F.3d at 796 (emphasizing the significance of the district court's instructions to jury to "consider the evidence for the limited and proper purposes"); *see also Douglas*, 482 F.3d at 601 (same); *United States v. Pettiford*, 517 F.3d 584, 590 (D.C. Cir. 2008) (same); United States v. Crowder, 141 F.3d 1202, 1210 (D.C. Cir. 1998) (en banc) (*Crowder II*) (stating that mitigating instructions to jury enter into the Rule 403 balancing analysis); *United States v. Mitchell*, 49 F.3d 769 (D.C. Cir. 1995) (stating that limiting instructions concerning other crimes evidence may guard against improper inferences). "[I]t is the law, pure and simple, that jury instructions can sufficiently protect a defendant's interest in being free from undue prejudice." *Perholtz*, 842 F.2d, at 361 (D.C. Cir. 1988), *cert. denied*, 488 U.S. 821 (1988) (citation omitted).

B. <u>ARGUMENT</u>

    1. <u>Evidence of the Use of Weapons and Acts of Violence, Evidence of the
Movement of Illicit Proceeds, and Evidence of the Existence of the
Conspiracy Prior to 1999</u>

As previously discussed above, evidence of violence, weapons, money laundering, and evidence of drug trafficking pre-dating the charged conspiracy should be admitted as inextricably intertwined with the charged conspiracy. However, the Government also moves, alternatively, to admit this evidence pursuant to Rule 404(b).

This Circuit has allowed evidence of violence, weapons and money laundering pursuant to Rule 404(b). In *Lorenzana-Cordon*, the Court found that the defendant's brother's possession and use of rockets to shoot down law enforcement aircraft constituted "other acts" evidence admissible under Rule 404(b), stating that the evidence explained "the circumstances around the alleged conspiracy by providing content and background to the jury." 141 F. Supp. 3d at 44. The court further noted that "completing the story" evidence, while not admissible in this Circuit as intrinsic evidence, may properly be admitted under 404(b) for any non-propensity purpose. *Id.* Furthermore, in *United States v. Morrow*, No. 04-355, 2005 WL 3159572, at *24-25 (D.D.C. Apr. 7, 2005), the court allowed evidence of weapons to show association and identity pursuant to Rule 404(b) in a bank robbery trial. Also, in *United States v. Burwell*, 642 F.3d 1062, 1067 (D.C. Cir. 2011), the court upheld the introduction of evidence of a carjacking (using guns), stolen cars, the use of false names, as well as cultivation and distribution of marijuana pursuant to Rule 404(b) under a theory of proving association with one another. In *United States v. Gooch*, the defendant participated in narcotics and racketeering conspiracies run by a group known as the "M" Street Crew" and the court admitted evidence of various uncharged incidents that took place during the time frame of the relevant conspiracies. *See Gooch*, 514 F. Supp. 2d at 70. Specifically, the court

in *Gooch* admitted evidence of the defendant's uncharged assault on a police officer which occurred while the defendant's co-conspirator's freed him from an attempted arrest, because such evidence "demonstrated [the defendant's] position in the M Street Crew and was intrinsic to the charged conspiracy." *Id.* Also, courts have found that evidence of a defendant's involvement in money laundering during the timeframe of the conspiracy can be intrinsic and "by its very nature does not involve *other* crimes, wrongs, or bad acts." *Lerma-Plata*, 919 F. Supp. 2d at 159. Therefore, co-conspirator's transporting of bulk currency is direct evidence of the conspiracy and advances the ultimate goal of drug trafficking. *Id.*

Additionally, the prosecution satisfies its burden in part, under Rule 404(b), by "identifying a legitimate purpose" for which the other crimes evidence could be used. *Manner*, 887 F.2d, at 321 (D.C. Cir. 1984). Here, proposed 404(b) evidence is probative of several issues, specifically 1) the Defendant's intent to distribute narcotics and to make profits from such illegal and dangerous activity; 2) the Defendant's knowledge that they were engaged in the distribution of narcotics and the manner and means by which they intended to follow through with the conspiracy; 3) the identity of members of the conspiracy; and 4) that the Defendant shared the common plan to carry out the co-conspirators' various intertwined drug trafficking and related criminal activities. Further, the evidence of the conspiracy prior to 1999 identifies the Defendant as the same individual participating in the charged conspiracy. The pre-1999 evidence also establishes that the Defendant used the same modus operandi in conducting his drug trafficking activities in that the same methods of transportation and the same subordinate co-conspirators were involved in the pre-1999 conduct and the conduct that occurred during the charged conspiracy. The witnesses' familiarity with the subordinates of the Defendant and the business model of the Defendant, is

directly connected with these witnesses' prior involvement in drug trafficking with the Defendant, which helped facilitate the charged conspiracy.

Additionally, the Government has the burden of proving that the Defendant was the individual involved in the charged conspiracy, and establishing the witnesses' familiarity with the Defendant, his role in the drug trafficking conspiracy, and his distinctive conduct is critical. Given this Circuit's longstanding precedent that Rule 404(b) permits admission of other acts evidence to prove identity, the Court should find the other crimes evidence admissible. *See United States v. Pindell*, 336 F.3d 1049, 1057 (D.C. Cir. 2003) (noting that "Rule 404(b) expressly permits the admission of 'other crimes' evidence to prove identity"). Therefore, this evidence should be admitted pursuant to Rule 404(b).

### V.   THE PROPOSED EVIDENCE IS NOT PREJUDICIAL UNDER RULE 403

Lastly with respect to Fed. R. Evid. 403, all the aforementioned evidence should be admissible because the probative value of the evidence substantially outweighs any prejudicial effect to the Defendants on three separate grounds. The danger that this Court must weigh is not the danger that the other crimes evidence will weaken the Defendant's defense, but rather the danger that the jury will misuse the evidence by inferring that, merely because the Defendant and their organization engaged in these prior bad acts, they were prone to commit the crime charged. *See Mitchell*, 49 F.3d at 777. The law in this Circuit is clear that in balancing the probativeness and prejudice of other crimes, "it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the offense charged." *Harrison*, 679 F.2d at 948.

The Court should find that the probative value of the alleged acts described above far outweigh any prejudice to the Defendant.  First, the alleged acts "constitute contemporaneous acts that facilitated the commission of the charged conspiracy – and are therefore inseparable from, and directly and highly probative of, the charged conspiracy." *Lerma-Plata*, 919 F. Supp. 2d at 160. Second and to reiterate from above, should the Court find that the evidence is not "part and parcel to the crime, "it is a sound rule that the balance should generally be struck in favor of admission," *Harrison*, 679 F.2d at 948 (quoting *Day*, 591 F.2d at 878), when the evidence, as it does here, indicates a close relationship to the event charged.  Third, the extent of any prejudice, or the potential misuse of such evidence by the jury, will effectively be eliminated by curative instructions by the Court before or immediately after the introduction of this evidence at trial and during the final instructions to the jury.  Thus, for the foregoing reasons, all evidence is not unduly prejudicial.

## VI.   EVIDENCE OF DEFENDANT'S PRIOR CONVICTION PURSUANT TO FEDERAL RULE OF EVIDENCE 609 SHOULD BE ADMITTED AT TRIAL

The Defendant is charged with conspiracy to commit drug trafficking offenses from 1999 to 2009.  The Defendant has been previously convicted of and sentenced to two (2) years incarceration on felony charges for transportation, selling and/or furnishing marijuana in the County of Los Angeles, Pomona Superior Court, California, Case No. KA012268.   The Government respectfully notifies Defendant and the Court of its intent to impeach Defendant, should he choose to testify, with this prior conviction pursuant to Fed. R. Evid. 609.

Evidence that an accused has been convicted of a crime punishable by more than one-year imprisonment may be used to impeach him if the probative value outweighs the prejudicial effect. Fed. R. Evid. 609.  As noted above, the Defendant has a prior conviction for a drug offense for which he was sentenced to two (2) years in prison.  This Court should permit the use of the

conviction to impeach the Defendant because its probative value outweighs any prejudicial effect. *United States v. Lipscomb*, 702 F.2d 1049, 1062 (D.C. Cir. 1983) (en banc) (noting that "all felony convictions are probative of credibility to some degree"); *see also United States v. Pettiford*, 238 F.R.D. 33, 41 (D.D.C. 2006) (court should consider the kind of crime involved, when the conviction occurred, importance of the witness's testimony to the case, the importance of the credibility of the defendant, and the general impeachment value of the prior crime).

With respect to the prejudice prong, the prejudicial effect of using this conviction for impeachment is outweighed by its probative value. *See United States v. Lewis*, 626 F.2d 940, 950 (D.C. Cir. 1980) ("[I]t is of prime importance that the jury be given as much help in determining credibility as the Rules of Evidence permit . . . It is unfair and misleading to a jury, when credibility is an issue, to refuse to admit relevant evidence that is directly probative on that issue.) As the Court knows, "[w]hen a defendant testifies at trial, he puts his credibility at issue." *United States v. Toney*, 27 F.3d 1245, 1254 (7th Cir. 1994). The Government's case will rely, in part, upon cooperating witnesses whose credibility will be at issue. If the Defendant chooses to testify at trial, the Government should certainly be allowed to impeach his credibility. *See Pettiford*, 238 F.R.D. at 41-42 (noting that it would be "unfair to the Government to completely prevent it from presenting" defendant's murder conviction in a constructive possession case).

At this time, the Government is not aware of the Defendant's trial witnesses and therefore, it is premature to file a Fed. R. Evid. 609 as to those potential witnesses. However, the Government respectfully reserves the right to make future motions *in limine* to introduce at trial prior conviction evidence of defense witnesses.

Therefore, the Government respectfully notifies Defendant and the Court of its intent to use Defendant's prior conviction for impeachment purposes.

## VII.    TRANSCRIPTS AND RECORDINGS SHOULD BE ADMITTED AT TRIAL

The Government may seek to introduce Spanish language consensually recorded telephone calls and lawfully intercepted wire recordings, and corresponding English language translations at trial in this case. The wire recordings were judicially authorized by the state of California and the District of Arizona.  The Government has identified wire and audio calls that the Government may seek to introduce at trial, and will complete production of the corresponding English-language transcripts by January.[3]  As set forth below, these Spanish recordings and English translations of these recordings should be admitted as substantive evidence at trial.

Transcripts of tape recordings may also be admissible as substantive evidence.  Where the recorded conversation is conducted in a foreign language, as is here, a transcription of the foreign language recording along with an English language transcript may be submitted to permit the jury to understand and evaluate the evidence.   *United States v. Cano-Flores*, 796 F.3d 83, 90 (D.C. Cir. 2015) (allowing English transcripts from Spanish language wiretap recordings to go back into the jury room for deliberations);  *United States v. Ben-Shimon*, 249 F.3d 98, 101 (2d Cir. 2001); *United States v. Font Ramirez*, 944 F.2d 42, 49 (1st Cir. 1991) ("It is permissible to allow an English language jury to evaluate evidence of a tape recorded conversation in Spanish solely through use of a properly authenticated English language transcript."); *United States v. Cruz*, 765 F.2d 1020, 1024 (11th Cir. 1985) (permitting an English language jury to consider translated transcripts as substantive evidence).  Foreign language transcripts are authenticated in the same manner as English language transcripts, except the proponent should also "provide testimony as to how they were prepared, the sources used, and the qualification of the person who prepared

---

[3] The Government is still in the process of narrowing down which calls they intend to introduce at trial.  The selected calls will be provided to defense counsel as soon as a determination has been made.

them." *United States v. Rizk*, 842 F.2d 111, 112 (5th Cir. 1988), *cert. denied*, 488 U.S. 832 (1988).

Courts have admitted English transcripts of foreign language conversations as substantive evidence in view of the fact that the jury would not understand the spoken foreign language. *United States v. Valencia-Rios*, 639 F. Supp. 2d 98, 102 n.2 (D.D.C. 2009) (holding that in a cocaine distribution case, jury viewed transcripts translating the Spanish heard on the tapes [of telephone calls] into English); *United States v. Wilson*, 115 F.3d 1185, 1189 (4th Cir. 1997); *United States v. Pena Espinoza*, 47 F.3d 356, 359 60 (9th Cir. 1995); *United States v. Garcia*, 20 F.3d 670, 673 (6th Cir. 1994); *United States v. Gonzalez-Balderas*, 11 F.3d 1218, 1224 (5th Cir. 1994); *United States v. Calderin Rodriguez*, 244 F.3d 977, 986 (8th Cir. 2001) (upholding the district court's evidentiary ruling at trial allowing an audiotape of telephone conversations in Spanish to be played for the jury while providing the jury with English transcripts which were taken away after the tape was played).   If the accuracy of the transcript is contested, competing transcripts may be submitted to the jury.

Therefore, the recordings of intercepted calls and the corresponding transcripts should be admitted at trial in this case.

## VIII.   THE LEAD AGENT SHOULD BE ALLOWED AT COUNSEL TABLE DURING TRIAL

Lastly, the Government seeks the Court's authorization to allow the lead case agent to sit at counsel table during the trial.  The Federal Rules of Evidence speak directly to this issue.  Fed. R. Evid. 615 codifies what is generally known as "The Rule on Witnesses" or "The Rule of Sequestration" requiring witnesses be excluded from trial proceedings so that they cannot hear the testimony of other witnesses.  However, Fed. R. Evid. 615 also delineates four separate exceptions to the general rule.  The Government submits that the lead investigative agent, a special agent for

the DEA, meets at least one of these exceptions, and as such, should be permitted to be seated at the Government's counsel table throughout the trial.

First, he is "an officer or employee of a party which is not a natural person," and by this pleading is "designated as its representative by its attorney."  In this context, the pertinent party to this litigation is the Federal Government, and as a DEA agent, is an employee of such.  The Federal Government's attorney in this matter is the United States Department of Justice, and as such the undersigned designate the DEA special agent as the Government's representative.  Fed. R. Evid. 615(2).

This exception to the general rule against a witness being present at trial applies to investigative agents, such as federal agents and police detectives.  Fed. R. Evid. 615 (advisory notes).  *See United States v. Farnham*, 791 F.2d 331, 334-35 (4th Cir. 1986) (stating that under Rule 615(2) a district court may allow the Government's investigating agent to remain in the courtroom throughout the proceedings, even if he is expected to testify).  This exception to the rule does not require the Government to establish that the agent's presence is essential to the presentation of the case; that requirement applies solely to the third exception listed in the rule. The Government, therefore, may have an investigative agent present in the courtroom, even if the agent will testify.

This Circuit has addressed this issue.  In *United States v. Sullivan*, this Circuit ruled that the Government may designate a law enforcement officer to remain in the courtroom as the Government's representative. 56 F.3d 1532 (D.C. Cir. 1995); *see United States v. Eiland*, 2006 WL 516743, (D.D.C., March 2, 2006).

Numerous other courts have issued similar rulings.  *See, e.g., United States v. Phibbs*, 999 F.2d 1053, 1072-73 (6th Cir. 1993) ("Rule 615(2) allows the Government to have any law

enforcement officer it wants at its counsel table."), *cert. denied*, 510 U.S. 1119 (1994); *United States v. Rivera*, 971 F.2d 876, 889 (2d Cir. 1992); *United States v. Adamo*, 882 F.2d 1218, 1235 (7th Cir. 1989); *United States v. Parodi*, 703 F.2d 768 (4th Cir. 1983); *United States v. Perry*, 643 F.2d 38 (2d Cir. 1981), *cert. denied*, 454 U.S. 835 (1981).  Furthermore, the decision to allow more than one law enforcement officer to remain in the courtroom as the Government's representative is within the discretion of the trial court.  *See United States v. Alvarado*, 647 F.2d 537, 540 (5th Cir. 1981).

The Government submits that the lead investigative agent, a special agent for the DEA, meets at least one of the exceptions, and as such, should be permitted to be seated at the Government's counsel table throughout the trial.

## IX.     CONCLUSION

For the foregoing reasons, in accordance with the governing and long-standing practice in this jurisdiction, the Government respectfully moves, that the Court admit the above co-conspirator statements, the proposed evidence as inextricably intertwined with the charged conspiracy and pursuant to Rule 404(b), admit the prior conviction evidence pursuant to Fed. R. Evid. 609, admit transcripts and recordings at trial, and allow the lead agent to be seated at counsel table during trial.

.

Respectfully submitted,

Arthur J. Wyatt
Chief, Criminal Division
U.S. Department of Justice
Narcotic and Dangerous Drug Section


By:        /s/
           LaRai Everett
           Emily Cohen
           Trial Attorney
           Narcotic  and  Dangerous  Drug  Section
           Criminal Division
           United States Department of Justice
           Two Constitution Square
           145 N Street, NE
           East Wing, Second Floor
           Washington, D.C. 20530
           Tel.: (202) 514-0917

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via the CM/ECF system, to counsel of record for the Defendant, this 16th day of October, 2017.

> _/s/_
> LaRai Everett
> Emily Cohen
> Trial Attorney
> Narcotic and Dangerous Drug Section
> Criminal Division
> United States Department of Justice